May it please the court. I start with the proposition that properly applied this court's decisions in the Clark cases should dispose of Lindsay Hecox equal protection plan. In Clark, Clark relied on the well-studded principle that there are average physiological differences between the sexes that are real and important in athletics and that give members of the male sex an advantage. And based on those average physiological differences between the sexes, Clark says that it's constitutional to have a bright line rule based solely on sex that satisfies heightened scrutiny to exclude all members of the male sex from female sports. This bright line rule that Clark upheld is constitutional even if we ignore all specific individual characteristics that might be at work for various student athletes. And even though consideration of those specific characteristics might create a better rule, because under intermediate scrutiny, we don't need to consider all those individual characteristics. It's enough to use a bright line sex-based rule. States don't have to make exceptions. They can have a bright line rule that says for purposes of female sports, no male athletes can participate. And so even if the Clark brothers had been different than the average male, let's say they had really low testosterone levels that were down like female levels and said, we can't compete with males. We want to go play female sports. That wouldn't have mattered under Clark. But once we deviate from that bright line rule that Clark set, and we start focusing on specific individual characteristics and demanding that those characteristics support the rule, then we're violating Clark, and we're violating intermediate scrutiny, and we're demanding something more. And that's what happened here. The district court demanded more than intermediate scrutiny. And it did it by mischaracterizing a sex-based rule as transgender discrimination. And it went further than that. Even though Idaho's law does not classify at all based on gender identity or transgender status, it classifies solely based on sex. The And it's not even proxy facial discrimination, as the plaintiffs would argue, because proxy discrimination requires that even though you don't name the group you're trying to regulate, you define the law in such a way that you are regulating just that group. So attacks on yarmulkes is attacks on Jews. But attacks on all head coverings, or all head coverings and hats is not proxy discrimination against Jews, even though they are regulated by that regulation. But doesn't, counsel, doesn't section, let's see, it's section 33-6203, sub only by showing reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels, all of which would appear to target transgender? Well, a couple of things, Your Honor. First of all, the exclusion we're talking about here appears up above. It's above that sub three that you quoted. That sub three deals only with the resolution of a dispute, if there's a dispute about someone's eligibility. And it says that you can resolve that dispute in three ways. One is you can simply provide written verification from your doctor. A second is you can rely on the high school consent and health examination form that every high school student has to submit. Or you can rely on an examination that's based on one of these three things that you cited. So first of all, I don't think that's a fair way to read that statute. Because as I understand it below, Ms. Teacox's attorney was willing to give you a statement from her doctor saying that her biological sex was female, and that was not acceptable to you. Is that correct? No, that's incorrect, Your Honor. What happened is, is I made this argument to the court at our preliminary injunction hearing. And I said, this is how this was read. It was amended. It was amended by the Senate to change it this way. It initially read the way you are construing it, but it was changed. And so I explained to the court that, yes, I was asked it. So if Ms. Teacox were able to come in with a doctor's letter verifying that she is female, would that resolve any dispute about her sex and eligibility? And I said, yes, that is the way we interpret this. And Ms. Teacox's attorney said she thought she could get that kind of letter from her doctor, but that was the last we heard of it. We didn't get that letter. So it's, that's not the way it happened. Are you saying I'm not reading the correct version of the statute? I'm saying that you are reading the correct version, if it's the version that we submitted in the record, but that, that statute was changed. Initially, it required that the only way to resolve a dispute was by reference to women. I don't want to belabor this, but it still says that if you look at subsection one, it says here are the classes and they're designated as such based on biological sex. And then you have your verification of biological sex. And I'm just going to X out the, as part of a routine sports physical examination, because we all know a routine sports physical examination does not include testing for these things, but it says relying only. And so it uses only, which ordinarily means exclusively on one or more of the following. And then it lists those three categories. Well, let's not get bogged down in this verification process. And let me just accept for purposes of this, that your interpretation is true and that those three criteria ought to apply up above as well. Then do they apply to a transgender person? Yes, they might. Do they also apply to non-transgender people? Yes, they absolutely do. So it's not targeting anyone to say, we're going to decide how we determine what sex you are if we use criteria that Does that answer the question? Not really, but you should move on. You have a minute and 23 seconds left. Thank you. I also want to touch on the fact that even if the district court had correctly interpreted this law as being facially neutral regarding gender identity, the Equal Protection Clause still would not be violated. That's because a facially neutral statute does not violate the Equal Protection Clause unless there is proof of invidious discrimination. And that's a very serious charge. That is saying that the legislature was motivated by animus against a protected group or had a mere desire to harm that group. And that's not what's at issue here. There is no invidious intent on behalf of the Idaho legislature to just simply harm transgender athletes. In fact, it treats some transgender athletes better than non-transgender athletes. So to suggest that this was just pure animus against transgender persons is just not right and not fair. And there's nothing in the record that would support such a finding. This is not animus at work here. This is just a tough policy choice that many respected voices differ on. And Idaho has chosen one way, and the Equal Protection Clause should not dictate its policy choices. I see I'm out of time. So unless there are any other questions, I'll keep my button. I have one question. Does this statute apply at all to men's sports teams? Like if a transgender woman wanted, became a man, wanted to play on a men's sports team, does this law apply? This law allows anyone to participate in men's sports. Your sex doesn't matter for men's sports, and it allows anyone to participate in co-ed sports. This law only regulates based on sex to protect opportunities for female athletes in female sports. Thank you. All right. So I guess it's Mr. Brooks. Yes, Your Honor. I'm representing the intervener defendants. I'd like to pick up where Mr. Zanzig left off by clarifying one point that can get lost in all the legal complexity, and that is that no one in this case is contending that there is a constitutional right to play according to gender identity. No one is disagreeing with Clark's fundamental recognition that males have large, quote, average real differences that give them powerful advantages in athletics, because everybody here agrees that it's reasonable and constitutional to exclude biological males with a female gender identity from female competition unless and until they take major medical steps to change their biology in some sense. And that's all for the same reasons this court has spelled out in Clark. Counsel, isn't that exactly the way the law worked in Idaho and across the country before this new law was enacted? Your Honor, it's not the way the law worked. What we had was the NCAA or the high school league policy that neither provided meaningful enforcement provisions nor a private right of action. So no. What's happened here is that the legislature has taken what the judge says was, in fact, the status quo practice. The judge found below that no transgender individuals had ever competed. The league had found it necessary to come up with rules that basically said males should not compete in female sports. I assume that had been an issue that arose before. There was a new challenge and the legislature said, no, we're going to reinforce what has been the time honored practice of separation by biology. And I'd like to call the court's attention to the fact that the existing NCAA policy did insist on separation by sex regardless of identity unless and until a biological male took a major medical step to affect their physiology. So given that... Wasn't the rule that they had to take hormone therapy to reduce the testosterone for levels in their system for a year before they could compete as a transgender woman or girl? Yes, Your Honor. My point was nobody's taking the absolute, you have a right based on identity. So then what's left is a dispute about degree, what level of degree would eliminate biological advantage? What level of fairness or unfairness for girls are we going to tolerate for other social goals, perhaps? And that includes the debate that Clark referred to as trade-offs between equity and practicality. And as you've seen in the briefs, I'm sure this is a policy question for which there are different answers coming out there from the World Rugby Federation that says, in our context, the answer is no, we just can't make this safe and fair. The IOC and the IAEF that say, well, we're going to prove through rigorous testing, you've achieved certain levels. Or the NCAA and the IHSAA, which proved to be the most lax of the types of policies out there and say, well, come on in as long as you tell us, and there really are not meaningful enforcement divisions, as long as you tell us that you have been taking testosterone suppression for a year. And that brings me to a important kind of missing factual predicate for the court's ruling that I would like to to this court's attention in the midst of this debate over degrees, because what the district court did was basically reach into that spectrum of policy options and constitutionalize the NCAA rule. And I'd like to highlight the extent to which there's literally no factual basis. I don't mean a disputed factual issue. I'm not talking about an error of fact. I'm talking about a necessary factual predicate that wasn't proffered by the plaintiffs, wasn't found by the court. The plaintiffs say, and I'll call your attention to page 51 of their brief, that the quote, driving force behind performance differences is the level of circulating testosterone. In other words, the argument is you can get it down, you eliminate the differences. Well, that was just the court analyzed that at length. It's disputed. We believe the court's finding was erroneous. But let's leave that to the briefs and just accept for a moment the plaintiff's contention that it's levels that account for all the male physiological advantage, levels of currently circulating testosterone. Here's the missing facts. There is no evidence offered. There was no finding that compliance with the NCAA policy reliably or even often achieves female levels. The only evidence in the record on the relationship between the NCAA policy, simply the fact of suppression, and any level is that it doesn't get it there. And that's from a study that was cited, relied on, and indeed co-authored by the plaintiff's expert, Dr. Safer. This is discussed in our brief at page 44, our opening brief. You can find Dr. Safer's report beginning at volume 5, page 696 of the appendix, the Lang et al study. What that study will tell you is that, and this is put together, put out by Boston Medical Center on a substantial sample, what they found is that in three out of four males who went through the standard suppression protocol until they achieved what the study calls steady state testosterone, that is, it's not getting any lower, three out of four did not achieve anything like female levels, and one quarter didn't achieve any reduction at all. So the only cited source on a relationship between the protocol and actually achieving levels introduced by the plaintiff's expert says it just doesn't work well and it doesn't work reliably. And the plaintiffs in the briefing, I want to point out to you, have tacitly conceded that. And what is tacitly conceded? Well, let me take you to footnote 12, page 54, where they say in response to our raising this point in our opening brief, they say, quote, that all transgender women may not achieve identical hormone levels after suppression. They go on. Well, if you translate that, what that says is, okay, let's stop talking about levels because that's not working for us. Let's change the subject. It doesn't work. It's not reliable. There's no evidence to bridge, to get the court from the NCAA policy to female levels. And yet it's female levels, plaintiff says, account, it's male levels above that, plaintiff says, account for all the difference. And this is the policy, this is no level requirements, no testing requirement. NCAA policy is the policy that the court below constitutionalized in its injunction. We can counsel, counsel, counsel, our levels reach during that one year of anti testosterone therapy. Critical, I'm thinking if somebody is born biologically male, according to anatomy, and has the normal male internal organ, organs functioning, and then tries out for college girls team, even if his testosterone has been effectively reduced for one year, he's had 19 years of building a bigger body, bigger muscles, bigger bones, as typically happens with males. Was, did any of the medical studies address that? Or is this just my own speculation? Your Honor, we've, we've certainly discussed that in our briefs, the point that there are important changes, height, bone size, strength, bone strength, that there are bells you can't unring when it comes to going through male puberty. I was simply calling the court and, and we discussed that in detail in our briefs. I wanted to call the court's attention to that. It is there, it is there already. And it is, but I said for the argument, I didn't want to take the time on the disputed issue of fact, I wanted to highlight the missing issue of fact and the fact that the NCAA requirement of simply engaging in suppression is relying on a technology, a medical technology that at this point, the evidence is it just doesn't work. And that the plaintiffs have tacitly conceded that that's all the science there is on this point in the record. Now, I've also would like to highlight in my last minute and 40 seconds, it's disputed as you've suggested, Your Honor, whether taking testosterone in a male after puberty down to female levels really unrings the bell. That's very disputed, but because of the dispute is so prominent in the court's analysis. I'd also like to highlight that it turns out to be an irrelevant question. Here's why it became irrelevant to the issue presented once the court dismissed the facial challenge, because he Cox doesn't make any claim to have achieved female levels or any particular level. And it's irrelevant to the pride of the injunction actually issued, which changed the state to the NCAA policy because the NCAA policy contains no requirement to achieve any particular levels. So we have this very strange world in which nobody's contending that you have a right simply to play according to your gender identity, unless you take serious medical steps. And yet the district court has constitutionalized the policy, which there is no evidence succeeds in reducing testosterone to female levels even half the time. And in a quarter of the cases, not at all. The state, Your Honor, was well within its rights to look at the policies being looked at the NCAA and IH SAA policies and say, you know what, that's not good enough to protect safety. This is the policy includes contact sports to include safety and fairness for girls and women in Idaho and pick a different answer off that spectrum of policy choices and intermediate scrutiny, which asks the question, is that policy substantially related to the goal of safety and fairness for women is clearly satisfied, as is illustrated by the Everybody's on board with the NCAA basic exclusion, unless and until you've taken medical steps. Thank you, Your Honor. Thank you, counsel. All right, Mr. Strangio. Thank you, Your Honors. Good afternoon. My name is Chase Strangio, and I represent plaintiffs Appellees Lindsey Hecox and Jane Doe. I want to start with setting the framework for what the context was. In the state of Idaho, there were already separate sports teams for boys, girls, and young men, women. That was the law in Idaho and in every state in the country. I have a couple of questions that are required to proceed the merits. There are two plaintiffs here. Jane Doe is concerned that she'll be forced to undergo medical examination because she says she wears pants instead of dresses. Most of her friends are boys, and she has, I can't remember how she described her build, but basically a masculine build, she thinks. So she's afraid she'll be mistaken for a boy. But I don't recall any declaration by Jane Doe that she ever had been mistaken for a boy. And some of the stuff seems silly. I mean, so many of the girls that I knew in high school, and I imagine it's true of all of us, had mostly, most of their friends were boys, and they wore pants instead of dresses. And now, gee, you hardly see any women in general. I think she is standing for two reasons. The first is that the policy of HB 500 is to subject women and girls, and only women and girls in sports, to the second procedure. It is not subjected to him. I'm just talking about Jane Doe now, not the general policy. I can't see why Jane Doe has standing to complain about the policy. Well, I think under a Northeast Florida chapter, under Baggy, the equality injury itself, it gives her article of understanding. She cannot compete on equal footing to the boys. Every time she steps on the field, she's subject. How does she know? How does she know? I mean, she's a girl. She can try out for the girls team. No one's ever said, oh, wait, we don't think you're a girl. It's not like East German athletes during the Soviet era. Nobody's ever suggested that she's not entirely female. So she can play on the girls team, as far as any of the facts show. That's my standing concern. So I think that she has alleged facts that show that she is concerned every time she steps on the field. I don't think that's unlike this court's opinion. Okay, I guess your argument then is the standing is based on her concern. Now let me address a mootness concern I have with Hecox. We got reversed in a very embarrassing and really grinding it in, in a case called Arizonans for Official English some years ago. A woman had worked in a government office, she spoke Spanish, and the office policy was she had to speak English. And that led to a test case about whether the state could require people to speak English in the state workplace. Well, she'd worked there for a summer, and then she went back to school, and there wasn't evidence that she was going to work there anymore. So even though we wrote a whole bunch of opinions about the merits, the Supreme Court said this case is moot because there's no continuing dispute. Now what I'm worried about with Hecox is she's dropped out of school, and she didn't make the team. So what's, what case is left for us to decide with Hecox? Well, I think under this court's mootness doctrine that there would have, it would have to be impossible for the court to grant relief under Center for Biological Diversity. And she is training to go back. She lives in Idaho. She has every intention of trying out again. And the Supreme Court in City of Fury v. Paths v. A.M., and since we did read the site, it is 529 U.S. 277, and that's a 2000 case. That was a strip club challenge to importance and immunity. By the time it reached the court, the club had closed. But the majority held, a majority of the judges held that the club still had concrete distinction to the extent it had intention in resuming operation. Here we know that Lindsay has a pre-intent to return to school. How do we know that? Do we have a declaration by her? I couldn't find her declaration, but the record is so voluminous I probably just missed it. I'd like to read her exact words about her plans and what she's done to realize them. Is there a declaration? There's not a declaration, Your Honor. There's a period of time between the... So how do I know? Most people, a whole lot of people start college and a whole lot drop out and never go back. How do I know she's gonna go back to college and try out for the team again? You say she says so, which matters, but I can't find where she says so, and you say there's no declaration. There's counsel's representation in the brief. I think that the question is, would it be impossible under this court's precedent to grant relief in this case? And I think that it would not be such that the case is not moved and that the court can't grant relief and that it's prior precedent as well as the city of Erie. I think that's what we have here. So it's just a representation in the brief? There is no declaration? There is no declaration. Got it. Thank you. Counsel, is it the fact that she's dropped out of school? I thought if she just is doing distance school the same way everybody else is doing it. Your Honor, she took a leave of absence after not making the team and is intending to return to school in the fall and try out again. And I think, you know, returning to the sort of larger substantive merits questions of the case, I think it's important to recognize first that Apollon's argument that this law does not discriminate on the basis of trans status simply cannot be reconciled with the text of the law and the context of its passage. By design, the law utilizes, as Judge Wardlaw had alluded to, a gerrymandered definition of biological sex, which is drawn intentionally narrowly to exclude the sole sex characteristic that every expert agreed is the primary driver of athletic performance differences between men and women, and that's circulating testosterone. And instead, what the law does is distinguish between cisgender athletes, so non-transgender athletes, who can compete in sports consistent with their gender identity, and transgender athletes, transgender women and girls, who cannot. And that's the entire purpose of the law, the singular effect of the law is to exclude trans women and girls and only trans women and girls from sports altogether. It's not the case. How do we know that's the purpose? I thought when I read what little there is about the purpose that it was to let girls not have to compete with boys because the boys tend to be bigger and stronger and it doesn't give the girls a fair shot at winning. I thought that's about all there was in the evidence for the purpose. Well, the reality of the conditions before the law was passed is boys were already prohibited from competing on girls' teams under Idaho state rules. So that was the status quo ante, but the way in which the HB 500 changed the law was to ban trans women and girls from sports. And that was the entirety of the legislative debate. That was the entirety of the national debate. And I think if you look at the sex dispute procedure in the law, and that's at 3362-03, the entire purpose of having a mechanism to dispute sex is to identify who's transgender and root them out. The men and boys don't assert themselves to be women and girls even when they're claiming a constitutional right potentially to participate on a girl's team. The purpose of that part of the law is to identify who's trans and then exclude them from participation in women's and girls' sports. And it's not the case, as economists have argued, that all biological males are treated the same because boys are still able to compete. They're still able to compete in boys' sports as they had before HB 500. It's only transgender women and girls who are barred from participating altogether. And the district court made factual... Wait a minute, they're not barred. Anybody can play on the boys' team whether they're transgender or not. Well, Your Honor, two responses to that. The district court made factual findings crediting plaintiff's expert that it is not feasible to force a trans girl to compete on a team for boys, crediting both expert testimony of Dr. Jack Turbin as well as home testimony that would undermine her medical treatment. It would be so substantially humiliating and that it is not a viable option. The argument that a trans girl can simply participate on a boys' team, there's a law that says anatomical boys can compete on the boys' team whether they're transgender or not. And we've got an opinion by a doctor saying that's a bad idea. Is that about where it lays? We have an opinion from a doctor that says transgender women and girls, people who have a gender identity that's female, who are suppressing their testosterone levels, are not able to compete on boys' teams. And the purpose of this analysis... Not able just means they're more likely to lose, doesn't it? It doesn't mean they're not allowed. Well, no, Your Honor. Under the terms of the law, they're technically permitted, but it's not that they're more likely to lose. It's that it would be so substantially disruptive to who they are, violate the core of their being, that someone who lives their life as a girl in every aspect of their life and then is forced onto a boys' team, that's a fundamentally different proposition than forcing someone who's a boy, who's celebrated as a boy athlete, who understands himself as a boy, to compete on the boys' team. But this is only one of the ways in which the law triggers heightened scrutiny. And in fact, everyone agrees that the law triggers heightened scrutiny. Even under Appellant's theory of the law, it's a sex-based rule. Under VMI, all sex-based rules trigger heightened scrutiny. And much of Appellant's argument hinges on a flawed reading of this court's decision in Clark I and Clark II. In the Clark decisions, this court upheld a general rule of sex separation in sport, an Arizona rule that permitted the state to bar boys from the girls' volleyball team. But that question in Clark is fundamentally different than the question here, which is whether Idaho passed a sweeping categorical ban that bars trans women and college from intramural and club teams to elite competition. And the three considerations that this court deemed relevant to the constitutional analysis in Clark, if applied to this context, highlight exactly all of the ways in which HB 500 is unconstitutional. So first, this court looked at whether or not permitting the Clark brothers to stay boys from the girls' volleyball team, if it's in place for the district court to consider that question. Mr. Stradgeo, for some reason, we're not hearing you very well right now. Okay. Can you hear me better? Yes. So in Clark, the district court went through the three factors that this court considered relevant to the constitutional analysis in Clark. And the first was whether allowing boys to compete on the girls' team would lead to substantial displacement of female athletes. Applying that first consideration, the district court found that allowing trans girls to compete on girls' teams would not lead to substantial displacement of cisgender girls for a number of reasons. First, based on sheer numbers alone, while cisgender men and boys represent 50 percent of the population, transgender individuals represent less than half of one percent. So there's simply no way, based on numbers alone, that there could be substantial displacement. Second, under the substantial displacement consideration, we have decades of practical experience showing that transgender women and girls have been competing on women's sports across the country, and the participants have been able to point to a grand total of four athletes, four transgender women and girls, who have had any success at any level. None of those athletes are currently competing, and the district court made factual points that at least three of them have been defeated by non-transgender girls. And third, on the science that the district court credited plaintiffs' acts of testimony, which found that under Idaho's pre-existing rules that required suppression of testosterone, that transgender women and girls did not retain any constitutionalized double-A rules or anything. Because the question isn't what is the appropriate policy in the abstract. The question is, under heightened scrutiny, does the rule that Idaho substantially advance any interest? And so definitely it's not, but we don't need to under the Clark announcement, after substantial displacement, was whether or not the boys in Clark still had overall opportunities. And of course, in the 1980s, the Clark brothers, as cisgender boys, had equal and better opportunities. Here we have a situation where under HB 500, transgender women and girls had no opportunity. And again, the district court made factual findings that it would be impossible for a transgender girl to be forced to compete on a team with only available options under HB 500, because she's barred from the girls' team. And the third consideration from this Clark was whether the group had been historically advantaged. Here we have a law that targets and discriminates against two historically disadvantaged transgender women and girls who are categorically banned from women and girls' courts, and all women and girls who, because of HB 500, are subject to intrusive sex dispute and verification every single time they step into the court. And beyond Helen misreading the law of reliance on transgender persons in Clark, they have failed to offer any evidence based on the rules that were the status quo of how categorically banning trans women and girls from every single level of the court substantially advances any governmental interest. We heard today from my colleague about a study that was in the record of the district court concerning levels of testosterone, but this is a forum to relitigate the fact that the district court made factual findings, concluding that there was no evidence of substantial discrimination, that there was no way in which categorically banned trans women and girls from courts substantially advances any important governmental interest. And the fact that there may be outlier studies or outlier information does not change the fact that we had 20 years of experience nationally, 10 years of experience in Canada, where the legislature could not point to a single trans athlete who was participating at all, let alone dominating the sheer breadth of the law and the sheer reach of it. It makes it impossible to accept it, the alleged purpose it's offering. And if appellants, you know, want to cast the picture, the rights of transgender girls, rights of cisgender girls are necessarily evident, that somehow including transgender girls in women's sports is going to compromise the interpretation. But this is a law that we've heard for 45 years, since the New York State Supreme Court ordered the USTA to Renee Richards to compete in the women's category of the US Open. She notably lost grounds that if we allow trans women to play in women's sports, that the domination of all trans women and girls. 45 years later, we have seen no domination. The state of Idaho passed a categorical ban on trans women and girls without a single example. Placement of cisgender girls, how any opportunities for transgender women, and in the process of banning trans women and girls from sports, the state of Idaho set up different and unequal rules for all women. Ultimately, this is a law that harms all women and girls, and the district court did not abuse its discretion in concluding that it would be violent. Unless your honors have any further questions. No, well, thank you very much, Mr. Sangio. Mr. Brooks. Yes, your honors, pardon me. I'm sure you're very used to that problem. I'm going to run through a variety of points. I'd like to start by highlighting the plaintiff's or the district court's basic flaw in applying intermediate scrutiny, which we've discussed in the brief, but I've referred to it as the framing challenge. Every single intermediate scrutiny case you will find, including FARC, poses the following question. You look at the line drawn by the statute, and let's focus on cases that have to do with line drawing according to sex or gender in statutes, and you ask the question, is that line, is that division substantially related to an important governmental interest? That's what the Clark court articulated, and I've read many cases, the Clark court had it right, that's the articulation, and instead, what the district court did, what the plaintiff's urge is ask, was the refusal to carve out an exception that's demanded by the plaintiff substantially related. Well, that framing error, if every plaintiff can come in and say, yeah, but what about me? Then that's not intermediate scrutiny. That's not a substantial relationship test. That becomes a test of perfection, which is not what intermediate scrutiny requires. Now, also in that context, I'll say the fact that the act may result in hardship for peacocks, or indeed for other individuals, is an issue that intermediate scrutiny recognizes, but says that doesn't change the constitutional analysis. As the Supreme Court said in Lawley, few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results. And of course, in the Clark case, young Clark simply was not permitted to play the sport that he had invested his young life up to that end. That was clearly very hurtful, there wouldn't have been multi-year litigation as a result, but it didn't change the proper intermediate scrutiny analysis. Mr. Strangio referred to a gerrymandered definition of biological sex, but the court below said that that definition perfectly excludes transgender athletes. Well, you can cast that in a prejudicial light, but what is being acknowledged there is that it's not that hard actually to separate biological males from females. That definition perfectly excludes biological males from female athletics. That's what it does, that's not gerrymandering, that's simply reaffirming the time-honored division. In both the brief and in argument, the plaintiffs had said, look, the plaintiffs, the state hasn't shown how excluding transgender individuals in every context could be constitutional. Again, that's standing the law in its head, as your honors will understand. That's trying to revive the facial challenge. But even in a facial challenge, the question is, can the plaintiff attacking the law show that it's unconstitutional in every context? And the answer is, no, the plaintiffs can't. Your honors, in the case of, in the Nagoyan case, Judge Kennedy, Justice Kennedy back in 2001 wrote, to fail to acknowledge even our most basic biological differences, risks making the guarantee of equal protection superficial and so deserving it. What that means is, when we try to ignore biological reality, people, girls, women like my clients get hurt, and that's what the issue in this case. Thank you, your honors. Thank you, counsel. Um, Hecox versus Little will be submitted, and this session of the court is adjourned for today. Thank you very much, counsel. Thank you. Thank you, your honor.
judges: Kleinfeld, Wardlaw, Gould